1  Neel Chatterjee (SBN 173985)
   *nchatterjee@goodwinlaw.com*
2  Luc Dahlin (SBN 305732)
   *ldahlin@goodwinlaw.com*
3  Daniel Mello (SBN 325714)
   *dmello@goodwinlaw.com*
4  **GOODWIN PROCTER LLP**
   601 Marshall Street
5  Redwood City, CA 94063
   Tel.: +1 650 752 3100
6  Fax.: +1 650 853 1038

7

8  *Counsel for Plaintiff*

9                UNITED STATES DISTRICT COURT

10              NORTHERN DISTRICT OF CALIFORNIA

11                 SAN FRANCISCO DIVISION

12

13  HUNGERSTATION LLC,                    Case No.  3:19-CV-5861

14              Plaintiff,                **COMPLAINT FOR DAMAGES AND**
                                          **EQUITABLE RELIEF**
15        v.                              **FOR VIOLATIONS OF:**
                                          **(1) DEFEND TRADE SECRETS ACT, 18**
16  FAST CHOICE LLC d/b/a PACE and        **U.S.C. §§ 1832 *et seq.*;**
    INSPIRING TRADING APPS LLC d/b/a      **(2) CALIFORNIA'S UNIFORM TRADE**
17  SWYFT,                                **SECRETS ACT, CAL. CIV. CODE §§**
                                          **3426 *et seq.*;**
18              Defendants.               **(3) COPYRIGHT ACT, 17 U.S.C. §§ 101 *et***
                                          ***seq.*, 17 U.S.C. §§ 1201 *et seq.*;**
19                                        **(4) COMPUTER FRAUD AND ABUSE**
                                          **ACT, 18 U.S.C. §§ 1030 *et seq.*;**
20                                        **(5) CALIFORNIA'S COMPREHENSIVE**
                                          **COMPUTER DATA ACCESS AND**
21                                        **FRAUD ACT, CAL. PENAL CODE §**
                                          **502(c); and**
22                                        **(6) CALIFORNIA'S UNFAIR**
                                          **COMPETITION LAW, CAL. BUS. AND**
23                                        **PROF. CODE § 17200**

24                                        **DEMAND FOR JURY TRIAL**

25

COMPLAINT FOR DAMAGES AND EQUITABLE RELIEF        CASE NO. 3:19-CV-5861
                                   1

**COMPLAINT**

Plaintiff Hungerstation LLC ("Hungerstation"), by and through its undersigned attorneys, brings this action against Defendants Fast Choice LLC d/b/a Pace ("Pace") and Inspiring Trading Apps LLC d/b/a Swyft ("Swyft") (collectively, "Defendants"), and alleges as follows:

**PRELIMINARY STATEMENT**

1. This case is about the theft of Hungerstation's intellectual property, including its proprietary source code, trade secrets, and copyrights.

2. Defendants have brazenly penetrated Hungerstation's computer systems and have stolen source code, trade secrets, and copyrighted materials in order to directly compete against Hungerstation. Defendants have sought to use this stolen intellectual property to take away Hungerstation's business opportunities that were built through countless man-hours and millions of dollars of investments.

3. Hungerstation brings this action in an effort to stop Defendants from continuing to exploit Hungerstation's stolen property to directly compete with Hungerstation in the market.

**THE PARTIES**

4. Plaintiff Hungerstation LLC ("Hungerstation") is a limited liability company formed under the laws of the Kingdom of Saudi Arabia, with its principal place of business at King Abdul Aziz Branch Road, Al Yasmin, Riyadh 13326, Saudi Arabia.

5. Defendant Fast Choice LLC d/b/a Pace ("Pace") is a limited liability company formed under the laws of the Kingdom of Saudi Arabia, with its principal place of business at Anas Bin Malek Road, Al Yasmin, Riyadh 11942, Saudi Arabia.

6. Defendant Inspiring Trading Apps LLC d/b/a Swyft ("Swyft") is a limited liability company formed under the laws of the Kingdom of Saudi Arabia. Upon information and belief, Swyft's principal place of business is in Al Khobar 34423, Saudi Arabia.

## JURISDICTION AND VENUE

7.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1338(a) and (b) because Plaintiffs' causes of action arise under the federal Copyright Act, Defense of Trade Secrets Act, and Computer Fraud and Abuse Act.   Further, this Court has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367.

8.      As set forth in the facts below, this Court has specific personal jurisdiction over each of the Defendants because each has sufficient minimum contacts with the State of California to satisfy California's long-arm statute and constitutional due process requirements.

9.      As set forth in the facts below, this Court also has specific personal jurisdiction over each of the Defendants under Federal Rule of Civil Procedures 4(k)(2) because none of the Defendants are subject to jurisdiction in any state's courts of general jurisdiction and each has sufficient minimum contacts with the United States of America to satisfy constitutional due process requirements.

10.     Venue is proper within the Northern District of California pursuant to 28 U.S.C. §§ 1391(b) and 1400(a), because this is the judicial district where (i) a substantial part of the events or omissions giving rise to the claim occurred; and (ii) Defendants are subject to personal jurisdiction.

## FACTUAL BACKGROUND

### A. Background on Hungerstation

11.     Hungerstation was one of the earliest and best-selling innovators in the online food delivery market. Hungerstation rapidly became, and today remains, one of the leading online food delivery services in the Kingdom of Saudi Arabia.

12.     Hungerstation was founded in 2012 by former Chief Executive Officer ("CEO") Ebrahim Al-Jassim ("Al-Jassim").   On October 26, 2015, Al-Jassim entered into a Shareholders Agreement with Hungerstation's parent company, Food Delivery Holding 12 S.a.r.l. ("FDH")

via a Mudaraba Islamic financing arrangement, wherein Al-Jassim retained 37% ownership of Hungerstation and FDH gained a 63% majority beneficial ownership of Hungerstation.   Al-Jassim remained CEO of Hungerstation, but was required to seek approval for certain actions.

13.     Hungerstation invested millions to develop three software applications ("apps"): (1) a customer-facing app, on which the customer can browse and order food offerings from local restaurants (2) a restaurant-facing app, which restaurants use to accept customer orders, and (3) a rider-facing app, which delivery persons or "couriers" use to pick up and deliver food.

14.     In operating these apps and accumulating data over time, Hungerstation developed valuable confidential information, including: (1) customer databases that include customer contact information for market purposes, buying patterns, and other business critical information; (2) restaurant databases that include all restaurants Hungerstation contracted, location, pricing, and customer buying patterns; (3) marketing strategies and tactics used by Hungerstation; and (4) contacts with key individuals and companies.

**B.  Background on Pace**

15.     Defendant Pace was originally incorporated as Fast Choice Trading Establishment[1] on March 2, 2017 by Abdulaziz Al-Omran ("Al-Omran"), the former (then-current) "Excellence Manager" at Hungerstation.  On September 11, 2018, Fast Choice Trading Establishment was converted into a limited liability company, Fast Choice LLC d/b/a Pace. Upon information and belief, Hungerstation's former executives, and current executives of Pace, are in control of many of the day-to-day activities of Pace.

16.     Pace owns and operates a rider-facing food delivery mobile app, wherein delivery persons or "riders" can accept customer orders before picking up and delivering food to the customer.

---

[1] Under Saudi Arabian law, an "establishment" is a sole proprietorship under the control of a single individual.

1

**C.  Background on Swyft**

2      17.    Defendant Swyft was established as Inspiring Trading Apps LLC d/b/a Swyft on

3  November 18, 2018, and is listed as 100% owned by Al-Omran.  Upon information and belief,

4  Hungerstation's former executives control of many of the day-to-day activities of Swyft.

5      18.    Swyft owns and operates a customer-facing food delivery mobile app, wherein

6  customers can place orders from restaurants and then a driver picks up and delivers food to

7  customers.  Swyft is a direct competitor of Hungerstation.

8

**D.  The Swyft-Pace Relationship**

9      19.    On information and belief, the Swyft and Pace entities were mere shells,

10  instrumentalities, and conduits through which each of the directors, officers, and employees did

11  business, financed, and carried on in name only.

12      20.    Swyft and Pace have a very close and intertwined relationship.  In fact, Swyft and

13  Pace have acted alter egos of each other.  Swyft and Pace operate financially as one entity.

14      21.    The directors, officers, and employees of each entity exercised control over the

15  other to such an extent that the individuality or separateness of each entity did not exist.

16      22.    For example, Swyft and Pace shared an office in Khobar, Saudi Arabia.

17  This office operated as one office and in one space.

18      23.    Pace employees also solicited developers to work on Swyft's iOS.

19      24.    On numerous occasions Swyft and Pace struggled to identify which company was

20  responsible for payments made on invoices that were paid out from an account shared by the two

21  companies.

22      25.    Pace accounts were used as a "launching bonus" for Swyft's app launch on iOS.

23      26.    Pace paid Netguru—a third-party mobile development company—on at least two

24  occasions for Netguru's development and launch support for Swyft's app.

25      27.    Pace's CTO wrote an e-mail to Payfort—a third-party vendor—requesting that

1    Payfort open a Swyft account.

2        28.    To maintain the fiction of separate business entities would promote fraud and

3    sanction injustice.

4        29.    Thus, Swyft and Pace should be treated as alter egos of each other with respect to

5    all claims in this case.

6            **E.   Hungerstation's Trade Secrets and Copyrights**

7        30.    Hungerstation is the owner of various U.S. and Saudi Arabian copyrights and

8    trade secrets at issue in this Complaint.[2]

9        31.    Hungerstation owns the source code for Hungerstation's: (1) rider-facing app; (2)

10   customer-facing app; and (3) restaurant-facing app.   Hungerstation has registered these

11   copyrighted materials with the U.S. Copyright Office.[3]

12       32.    Hungerstation creates, stores, and updates its copyrighted source code on GitHub

13   servers.  GitHub is a U.S.-based company, incorporated in Delaware and headquartered in San

14   Francisco, California.  Upon information and belief, GitHub's servers are located in California,

15   Washington, and Virginia.

16       33.    Hungerstation stores, updates, and uses images on its Amazon Web Services, Inc.

17   domain, which it controls through a Cloudflare, Inc. account.

18       34.    After operating the apps and accumulating and analyzing data over time,

19   Hungerstation also developed additional valuable confidential intellectual property, including,

20   among other things: (1) customer databases showing customer contact information for market

21   purposes, buying patterns, and other business critical information; (2) restaurant databases

22   showing all restaurants Hungerstation contracted to deliver food, location, pricing, and customer

23

24   [2] Saudi Arabia and the United States are signatories to the Berne Convention and
     Hungerstation's Saudi Arabian copyrights may be asserted in the United States.

25   [3] *See* U.S. Copyrights Regs. Nos. TXu002156977 and TXu002156979.

buying patterns; (3) marketing strategies and tactics that helped propel Hungerstation to the market leader in the country; and (4) contacts with key individuals and companies necessary to successfully run an online food delivery business in an emerging market.

35. The Hungerstation intellectual property confer a competitive advantage to Hungerstation, allowing Hungerstation to track, target, sell, and provide appropriate services to its existing and potential future customers, riders (i.e., drivers), and restaurants. The competitive advantage and value of this intellectual property arises from the confidential nature of the information. This intellectual property was compiled and/or created at great expense and time to Hungerstation.

**F. Hungerstation's Measures to Maintain Confidentiality of its Trade Secrets**

36. Hungerstation maintains the confidentiality of the above-listed information and has taken reasonable steps to maintain such confidentiality.

37. All Hungerstation servers and databases, which store its information, can only be accessed by individuals with authorized credentials from Hungerstation. Hungerstation only provides authorization credentials to employees or parties who have signed agreements agreeing to protect Hungerstation's technical and confidential information. Hungerstation monitors logs that track who has accessed what information in order to ensure the confidentiality of its information.

38. All Hungerstation electronic devices have their own individualized authentication credentials. The Hungerstation internet networks also have their own authentication credentials. Only Hungerstation employees, who have agreed to maintain the confidentiality of Hungerstation's information, are given authorization credentials.

39. Hungerstation's physical premises are protected by physical locks, biometric locks, cameras, and security guards.

40. All Hungerstation employees agreed, as a provision of their employment

contracts, to protect and maintain the confidentiality of Hungerstation's technical information, confidential information, and trade secrets.

41.     All Hungerstation employees must also agree to a Code of Conduct as a condition of their employment.  The Code of Conduct, among other things, prohibits unauthorized access of Hungerstation intellectual property; the transmission of Hungerstation proprietary information, trade secrets or other assets without authorization; and requires that "[e]mployees must hold in the strictest confidence information concerning pricing, products and services that are being developed, and other such trade secrets, including information pertaining to any Prospective HS acquisition or divestiture."  The Code of Conduct also states that "[a]ll documents, files, records and reports acquired or created in the course of employment with HS remain the property of HS. Employees may only remove originals or copies of such property from HS's offices for the sole purpose of performing their duties to HS, and they must return such records at any time upon request."

## G. Defendants' Scheme to Raid and Counterfeit Hungerstation's Intellectual Property

42.     Defendants' agents and officers, then acting as executives of Hungerstation, together with other managers and software developers at Hungerstation, effectuated a scheme to covertly copy and exploit Hungerstation's proprietary software, proprietary databases, confidential information and resources for the benefit of Defendants, Hungerstation's direct competitors.

43.     Upon information and belief, Defendants' agents and officers, then acting as executives of Hungerstation, launched a plan to raid Hungerstation's intellectual property for the benefit of Defendants, who were direct competitors of Hungerstation.  Defendants' agents and officers attempted to recruit or exploit key members of Hungerstation's senior management team and software development team to either join Defendants under the same, or similar, positions

(collectively, the "Defendants' Employees") or to transfer confidential information to Defendants. The Defendants' Employees, along with Defendants' agents and officers, used Hungerstation and personal email addresses to communicate and effectuate the scheme.

44.     Upon information and belief, the scheme involved penetrating Hungerstation's computer servers in the United States in order to steal Hungerstation's trade secrets in an attempt to supplant Hungerstation's businesses related to: (1) a customer-facing app for on which the customer can browse food offerings from local restaurants and use the app to place an order; (2) a restaurant-facing app, which restaurants use to accept customer orders before preparing the food; and (3) a rider-facing app, which delivery persons or "couriers" use to accept customer orders before picking up and delivering the food to the customer.

45.     Upon information and belief, the scheme also included accessing and misappropriating Hungerstation's confidential data on its restaurants/drivers/customers, financial analyses, and business plans in order to create a competitor on the back of Hungerstation's valuable intellectual property.

46.     The Defendants' Employees used their then-valid Hungerstation credentials to wrongfully access, copy, and steal Hungerstation's GitHub repositories of copyrighted and proprietary source code. Upon information and belief, the Defendants' Employees, with full knowledge of the wrongful nature of their acts, also gave their credentials to other employees of Defendants, such as Defendants' software developers, who were not authorized to access Hungerstation's GitHub servers, in order for those employees to access, copy, and steal Hungerstation's proprietary and copyrighted source code.

47.     GitHub is a U.S.-based company with headquarters in San Francisco, California that provides hosting for software development version control using Git. It is a subsidiary of Microsoft Corp. Upon information and belief, its servers storing its customers' source code are located in California, Washington, and Virginia.

48.     Upon information and belief, the Defendants were aware that GitHub was a U.S.-based company with servers in California.  Defendant Pace has partnered with GitHub to store Pace's copycat source code on GitHub's U.S. servers.  Upon information and belief, Defendant Swyft has also partnered with GitHub to store Swyft's copycat source code on GitHub's U.S. servers.  Upon information and belief, Defendants Pace and Swyft signed contracts with GitHub as part of their partnerships, that relied on, and were governed by, United States laws.

49.     Defendants Pace and Swyft purposefully accessed Hungerstation's GitHub repositories stored in the United States and copied Hungerstation's copyrighted proprietary software, storing the infringing source code on their own GitHub repositories/servers in the United States.

50.     Upon information and belief, Defendants then contracted with California-based Apple, Inc. and Google LLC, and transmitted executable files created using the infringing source code to those companies to be stored on their California-based servers, to distribute Defendant's infringing apps to smart phone users across the world.  Upon information and belief, as part of the scheme to distribute the infringing materials, Defendants signed terms of services and/or other contracts with Apple and Google regarding the apps that explicitly contained choice of law provisions stating that California laws would govern the agreements.  Defendants' apps are available for download in the United States on Apple's AppStore and on Google Play.

51.     Upon information and belief, Defendants have also accessed Hungerstation's confidential data stored on Hungerstation's Amazon Web Services, Inc. servers, based in the United States, controlled through Cloudflare, Inc.'s services, also based in the United States. Defendants used this unauthorized access to steal Hungerstation's (1) customer lists and associated data for its food delivery service; (2) restaurant lists and associated data for its food delivery service; (3) driver lists and associated data for its food delivery service; (4) pricing and financial analyses for its food delivery service; and (5) business plans for its food delivery

service.

52.     Upon information and belief, Defendants knew that such data was stored on U.S.-based servers as Defendants and the individual wrongdoers were closely involved in the day-to-day operation of Hungerstation and were aware of Hungerstation's internal procedures and partnerships with U.S. based companies.

53.     Defendants purposefully reached into California and the United States to: (1) wrongfully, and without permission, access California and United States computer systems storing Hungerstation's confidential source code, data, and business plans; (2) copy Hungerstation's source code, data, and business plans to other California servers, that thereafter stored infringing copies of the source code, data, and business plans; (3) use California-based entities to distribute the infringing software to a world-wide market.  Defendants cannot be allowed to use the United States and property within the United States as a safe haven from which to perpetuate its worldwide scheme.

54.     No other jurisdiction exists wherein Plaintiff may seek the relief requested.  No foreign jurisdiction will have control or power over the U.S. servers and corporations that are being currently used to misappropriate, store, and distribute the copycat phone apps and associated data and business plans.  The United States is the only forum that can grant a meaningful injunction to prevent Defendants from continuing to infringe Plaintiff's copyrights and misappropriate Plaintiff's trade secrets.

**H.  Defendants' Scheme Related to Defendant Pace**

55.     In early 2018, Hungerstation began developing a new proprietary rider-facing app for its food delivery service.  A working "alpha" version of the app was completed by April 2018 and the app was finalized during the summer of 2018.  Meanwhile, in July 2018, the Defendants' Employees, officers and agents wrongfully accessed Plaintiff's GitHub repositories to access and copy the source code for Hungerstation's rider-facing app.  The Defendants' Employees, officers

1   and agents then copied this source code into a separate GitHub repository under the control of

2   Pace.

3          56.     GitHub logs show that throughout the development of the Hungerstation rider-

4   facing app, the Defendants' Employees, officers and agents continually tracked changes to the

5   Hungerstation source code and, often within minutes or hours of the Hungerstation code being

6   modified, copied such changes into the Pace source code repository.  At some point, the

7   Defendants' Employees "forked" (i.e., copied) the  entire Hungerstation source code repository

8   into the Pace repository.  Upon information and belief, the Defendants' Employees, officers and

9   agents also transferred their access credentials to other employees and/or agents of Defendants

10  so those individuals, who had no authorization to access Hungerstation's computer systems,

11  could access, review, copy, and use Hungerstation's intellectual property.

12         57.     Defendants' Employees then instructed their software developers to "reskin" the

13  stolen source code, i.e., change the color scheme and logo on the Hungerstation app to match the

14  Pace color scheme and logo, while leaving the substance of the Hungerstation source code

15  unchanged.

16         58.     A comparison of the source code files and logs in the Hungerstation and Pace

17  GitHub repositories shows that: (1) the number of files that were changed is identical; (2) the

18  filenames of the changed files were identical; and (3) the changes to each of those files was

19  identical.  There is no reasonable possibility, therefore, that Pace independently created its source

20  code.

21         59.     Around this time, Defendants' Employees, agents and officers began informing

22  users of the Hungerstation rider-facing app that they would need to transition to the Pace app and

23  that Plaintiff would no longer support the Hungerstation app.  This was a lie designed to

24  encourage Hungerstation's drivers to migrate to Pace.

25         60.     Also at this time, as a result of the drivers migrating to the Pace rider-facing app

and as part of the scheme, Defendants' officers, then Hungerstation officers, notified Hungerstation that it would need to rely on Pace and Pace's rider-facing app as its exclusive means of interacting with drivers as part of its food delivery service.  At the same time, Pace began to surreptitiously cancel orders sent to drivers that were originally placed through the Hungerstation customer-facing app, causing Hungerstation customers' food orders to be dropped without notice.  Pace continued to service other food delivery apps, without dropping orders, from the other Defendant, Swyft.

61.     Defendants' Employees, officers and agents began recruiting Hungerstation employees to join Pace, usually under false pretenses, even telling Hungerstation employees they were working for a "sister company."  Defendants' Employees, officers and agents used confidential Hungerstation documents and data to determine which employees to target and to determine the appropriate financial offers to extend.  Emails show that Defendants' Employees, officers and agents were aware of the illegality and wrongful nature of their acts and that they discussed deleting emails and evidence to hide their involvement.

## I. Defendants' Scheme Related to Defendant Swyft

62.     Defendants' Employees, officers and agents, while then employees, officers, and/or agents of Hungerstation, formed Inspiring Trading Apps LLC d/b/a Swyft on November 18, 2018 as a direct competitor to Hungerstation.  Whereas Pace was meant to compete with Hungerstation's rider-facing app, Swyft was incorporated as part of the scheme to misappropriate Plaintiff's trade secrets and copyrights with regards to its customer-facing app (wherein a customer can place an order for an online food delivery).

63.     In August 2018, prior to the legal formation of Swyft, Defendants' Employees, officers and agents began secretly communicating with each other discussing the development of the Swyft app.  Secretly, Defendants' Employees, officers and agents began to redirect Hungerstation employees towards spending their time on Swyft business and development.

64.     Upon information and belief, Defendants' Employees, officers and agents wrongfully accessed Plaintiff's GitHub repositories to access and copy the source code. Defendants' Employees, officers and agents then copied this source code into a separate repository under the control of Swyft.

65.     Swyft also copied Hungerstation's proprietary and confidential restaurant database used in Hungerstation's customer-facing app.  Hungerstation, at great cost and time, had created a database of restaurants in its current and planned future areas of operation.  This database included unique "restaurant IDs" for each restaurant, restaurant menus and photos that were manually created/edited and/or updated for each restaurant, and unique approximions of each restaurants GPS location (latitude and longitude) based on a proprietary algorithm created by Hungerstation.  The location data, for example, cannot be found on Google maps and required intensive work to compile.

66.     The evidence of Swyft's theft did not end there.  The "restaurant IDs" in the Swyft app were exact matches to the corresponding "restaurant IDs" in the Hungerstation app. Messages being sent between the Swyft app and servers contained key elements with the value "hungerstation."  As of July 2019, all of the menu images (e.g., photos of dishes) in the Swyft app were hosted on Hungerstation servers – i.e., the Swyft app directly pulls such images from the Hungerstation servers.   89.6 percent of the location data on the Swyft app came from the Hungerstation databases.  Overall, 99.3 percent of the Swyft data (including restaurant IDs, restaurant details, and menu information) was an exact match to the data from the Hungerstation databases.

## COUNT I
### Misappropriation of Trade Secrets Under Defend Trade Secrets Act
### (18 U.S.C. § 1836, et seq.)

67.     The allegations of paragraphs 1 through 56 are incorporated herein by reference.

68.     Hungerstation owns and possess confidential and trade secret information, as

alleged above.   Hungerstation invested substantial resources in developing its online food delivery service, including, , data associated with drivers/riders, customers, and restaurants, business plans related to its food-delivery services, and pricing and financial analyses related to its food-delivery services.   Hungerstation likewise invested substantial resources in developing the source code for its rider-facing, customer-facing, and restaurant-facing apps and for its backend services related to those apps.   Hungerstation also maintained and protected lists of information crucial to the development and eventual success of Hungerstation's services and products, including lists of open development issues and lists of potential partners or acquisition targets.

69.     Because the above-discussed confidential information is crucial to the success of its business, Hungerstation makes substantial efforts to keep this confidential information from its competitors and the public.

70.     Hungerstation has taken, at all relevant times, reasonable efforts to maintain the secrecy of its confidential information, including by requiring its employees, as a condition of employment, to abide by a strict Code of Conduct forbidding disclosing, using, or transmitting any Hungerstation confidential information, and by requiring that all persons accessing Hungerstation's repositories and databases have personalized authentication credentials in order to access such repositories/databases.

71.     The efforts that Hungerstation takes are reasonable under the circumstances to maintain the information's secrecy.   Hungerstation takes these measures to ensure the confidentiality of its information because this information derives independent economic value because it is not generally known to the public or to other persons who can obtain economic value from its disclosure or use.   Hungerstation's competitors would obtain economic value form the use and disclosure of this information by, for example, obtaining a "head start" as compared to the process of developing and supporting its own online food delivery services without the

improper use of this information.  Competitors could also use the business plans and financial analysis to undercut Hungerstation in the market or to specifically target Hungerstation's partners or potential acquisitions.  Accordingly, the above-described information constitutes "trade secrets" under the Defend Trade Secrets Act, 18 U.S.C. §§ 1836, *et seq*.

72.   Through the scheme, Defendants acquired knowledge and custody of Hungerstation's trade secrets.  Defendants, and the individuals working on behalf of the Defendants as part of the scheme, knew or had reason to know that Hungerstation's information was confidential and that they had a duty to maintain the secrecy of that information.  Indeed, Defendants and the individuals working on their behalf were aware of Hungerstation's Code of Conduct forbidding the unauthorized access, use, or transmission of such information.  Additionally, it is well known in the industry that such information (source code, customer lists, databases of collected information, business plans, etc.) are highly valuable and confidential.

73.   Defendants emails and other communications evidence that Defendants were aware of the wrongful nature of their acts, that they were not authorized to access/use/disclose the above-mentioned trade secrets, and that they schemed to hide their involvement and use of such information.

74.   Defendants misappropriated Hungerstation's trade secrets by improperly using the trade secrets to develop and market a competitive service and products and by disclosing Hungerstation's trade secrets to others.

75.   Hungerstation's confidential and trade secret information relates to products and services used, sold, or intended to be used or sold, in interstate and foreign commerce.  Hungerstation's apps are available to, and used by, customers across the world.

76.   Because Defendants knew of Hungerstation's ownership of trade secrets and nonetheless acted in knowing disregard of those rights by making unauthorized use of Hungerstation's trade secrets to develop competitive products and services, Defendants' acts of

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

misappropriation were done willfully and maliciously, thereby entitling Hungerstation to attorneys' fees and exemplary damages to be proved at trial pursuant to 18 U.S.C. §§ 1836(b)(3)(c)-(d).

77.     As a direct and proximate result of Defendants' conduct, Hungerstation has suffered and will continue to suffer monetary damages in an amount to be determined at trial.

78.     Defendants' conduct is causing and will continue to cause Hungerstation to suffer irreparable harm and, unless Defendants are restrained, Hungerstation will continue to be so damaged, because it has no adequate remedy at law.  This irreparable harm includes loss of secrecy, the loss of market share, and the loss or impairment of business opportunities.

**COUNT II**
**Misappropriation of Trade Secrets Under California Uniform Trade Secrets Act**
**(Cal. Civ. Code § 3426, et seq.)**

79.     The allegations of paragraphs 1 through 68 are incorporated herein by reference.

80.     Hungerstation owns and possess confidential and trade secret information, as alleged above.  Hungerstation invested substantial resources in developing its online food delivery service, including data associated with drivers/riders, customers, and restaurants, business plans related to its food-delivery services, and pricing and financial analyses related to its food-delivery services.  Hungerstation likewise invested substantial resources in developing the source code for its rider-facing, customer-facing, and restaurant-facing apps and for its backend services related to those apps.  Hungerstation also maintained and protected lists of information crucial to the development and eventual success of Hungerstation's services and products, including lists of open development issues and lists of potential partners or acquisition targets.

81.     Because the above-discussed confidential information is crucial to the success of its business, Hungerstation makes substantial efforts to keep this confidential information from its competitors and the public.

82.     Hungerstation has taken, at all relevant times, reasonable efforts to maintain the secrecy of its confidential information, including by requiring its employees, as a condition of employment, to abide by a strict Code of Conduct forbidding disclosing, using, or transmitting any Hungerstation confidential information, and by requiring that all persons accessing Hungerstation's repositories and databases have personalized authentication credentials in order to access such repositories/databases.

83.     The efforts that Hungerstation takes are reasonable under the circumstances to maintain the information's secrecy.   Hungerstation takes these measures to ensure the confidentiality of its information because this information derives independent economic value because it is not generally known to the public or to other persons who can obtain economic value from its disclosure or use.  Hungerstation's competitors would obtain economic value form the use and disclosure of this information by, for example, obtaining a "head start" as compared to the process of developing and supporting its own online food delivery services without the improper use of this information.  Competitors could also use the business plans and financial analysis to undercut Hungerstation in the market or to specifically target Hungerstation's partners or potential acquisitions.   Accordingly, the above-described information constitutes "trade secrets" under California's Uniform Trade Secrets Act, Cal. Civ. Code §§ 3426, *et seq*.

84.     Through the scheme, Defendants acquired knowledge and custody of Hungerstation's trade secrets.  Defendants, and the individuals working on behalf of the Defendants as part of the scheme, knew or had reason to know that Hungerstation's information was confidential and that they had a duty to maintain the secrecy of that information.  Indeed, Defendants and the individuals working on their behalf were aware of Hungerstation's Code of Conduct forbidding the unauthorized access, use, or transmission of such information. Additionally, it is well known in the industry that such information (source code, customer lists, databases of collected information, business plans, etc.) are highly valuable and confidential.

85.     Defendants emails and other communications evidence that Defendants were aware of the wrongful nature of their acts, that they were not authorized to access/use/disclose the above-mentioned trade secrets, and that they schemed to hide their involvement and use of such information.

86.     Defendants misappropriated Hungerstation's trade secrets by improperly using the trade secrets to develop and market a competitive service and products and by disclosing Hungerstation's trade secrets to others.

87.     Hungerstation's confidential and trade secret information relates to products and services used, sold, or intended to be used or sold, in interstate and foreign commerce. Hungerstation's apps are available to, and used by, customers across the world.

88.     Because Defendants knew of Hungerstation's ownership of trade secrets and nonetheless acted in knowing disregard of those rights by making unauthorized use of Hungerstation's trade secrets to develop competitive products and services, Defendants' acts of misappropriation were done willfully and maliciously, thereby entitling Hungerstation to attorneys' fees and exemplary damages to be proved at trial pursuant to Cal. Civ. Code §§ 3426.4, 3426.3(c).

89.     As a direct and proximate result of Defendants' conduct, Hungerstation has suffered and will continue to suffer monetary damages in an amount to be determined at trial.

90.     Defendants' conduct is causing and will continue to cause Hungerstation to suffer irreparable harm and, unless Defendants are restrained, Hungerstation will continue to be so damaged, because it has no adequate remedy at law.  This irreparable harm includes loss of secrecy, the loss of market share, and the loss or impairment of business opportunities.

## COUNT III
## Copyright Infringement
## (17 U.S.C. § 101, et seq.)

91.     The allegations of paragraphs 1 through 80 are incorporated herein by reference.

92.     Hungerstation is the legal owner of copyrights in the Hungerstation source code, which have been filed with the United States Copyright Office (U.S. Copyright Registration Nos. TXu002156977 and TXu002156979).

93.     As described above, Hungerstation exclusively owns and controls the Hungerstation source code, which is used in Hungerstation's apps and backend software services.

94.     Upon information and belief, Defendants Swyft and Pace copied the Hungerstation source code, thus infringing Plaintiffs' exclusive rights under the Copyright Act, 17 U.S.C. § 106(1).

95.     Upon information and belief, Defendants Swyft and Pace have used those copies of the Hungerstation source code to create derivative source code files, including apps that merely have different colors and logs, thus infringing Plaintiffs' exclusive rights under the Copyright Act, 17 U.S.C. § 106(2).

96.     Upon information and belief, Defendants Swyft and Pace distributed the copies of the Hungerstation source code to others, including to Google and Apple, thus infringing Plaintiffs' exclusive rights under the Copyright Act, 17 U.S.C. § 106(3).

97.     Hungerstation never authorized or licensed Defendants Swyft to make copies, derivatives, or distribute the Hungerstation source code.

98.     Defendants Swyft's and Pace's conduct was and continues to be knowing and willful.

99.     As a direct and proximate result of Defendants Swyft's and Pace's conduct, Hungerstation has suffered and will continue to suffer monetary damages in an amount to be determined at trial.

100.     Defendants Swyft's and Pace's conduct is causing and will continue to cause Hungerstation to suffer irreparable harm and, unless Defendants Swyft and Pace are restrained, Hungerstation will continue to be so damaged, because they have no adequate remedy at law.

## COUNT IV
## Violation of Computer Fraud and Abuse Act
### (18 U.S.C. § 1030 et seq.)

101.   The allegations of paragraphs 1 through 94 are incorporated herein by reference.

102.   Defendants violated 18 U.S.C. § 1030(a)(5)(C) by intentionally giving Hungerstation access credentials to others who were unauthorized to access Hungerstation's computer systems.   These agents/employees of Defendants used those credentials to access Hungerstation's GitHub and Amazon U.S.-based servers—protected computers—without authorization, and as a result, caused damage to Hungerstation by copying, storing, and using Hungerstation's confidential information and/or data.

103.   By giving Hungerstation's access credentials to Defendants employees, Defendants have masked the true actors who unlawfully accessed Hungerstation's computer systems.

104.   As a result of these takings, Defendants conduct has caused a loss to Hungerstation of more than $5,000 in value in real economic damages during any one-year period.

105.   Defendants' unlawful access to Hungerstation's servers and computer systems has caused Hungerstation irreparable injury.   Unless restrained and enjoined, Defendants will continue to commit such acts.   Hungerstation's remedy at law is not adequate to compensate it for these inflicted and threatened injuries, entitling Hungerstation to remedies including injunctive relief as provided by § 1030(g).

## COUNT V
## Violation of California's Comprehensive Computer Data Access and Fraud Act
### (Cal. Penal Code § 502(c))

106.   The allegations of paragraphs 1 through 99 are incorporated herein by reference.

107.   Defendants violated Cal. Penal Code § 502(c) by intentionally accessing Hungerstation's GitHub and Amazon servers—protected computer systems—without

authorization, and as a result, caused damage to Hungerstation by copying, storing, and using Hungerstation's confidential information and/or data (including source code, images, business plans, financial analyses, etc.).

108.    Defendants knowingly used data, computers, computer systems, or computer networks by accessing, collecting, and transmitting Hungerstation's information and/or data in violation of § 502(c)(1).

109.    Defendants knowingly accessed and without permission took, copied, and made use of Hungerstation's information and/or data in violation of § 502(c)(2).

110.    Defendants knowingly and without permission used or caused to be used computer services by impermissibly accessing, collecting, and transmitting Hungerstation's information and/or data in violation of § 502(c)(3).

111.    Defendants knowingly and without permission provided or assisted in providing a means of accessing a computer, computer system, or computer network by providing access credentials to other entities allowing them to impermissibly access, collect, and transmit Hungerstation's information and/or data in violation of § 502(c)(6).

112.    As a direct and proximate result of Defendants' unlawful conduct within the meaning of § 502, Defendants have caused loss to Hungerstation in an amount to be proven at trial.  Hungerstation is also entitled to recover attorneys' fees pursuant to § 502(e).

113.    Defendants unlawful access to Hungerstation's servers and computer systems has caused Hungerstation irreparable injury, entitling Hungerstation to remedies including injunctive relief.

**COUNT VI**
**Unfair Competition**
**(Cal. Bus. and Prof. Code § 17200)**

114.    The allegations of paragraphs 1 through 118 are incorporated herein by reference.

115.    Section 17200 proscribes unfair business competition and defines this to include

1    any unfair, unlawful, or fraudulent business practice or act.

2            116.    Defendants violated Section 17200 through their conduct alleged above, including

3 their unlawful violations of the CFAA and the CCCL. Defendants also violated Section 17200

4 by having their agents, without authorization and with knowledge of their wrongdoing, re-task

5 Hungerstation's employees from working on Hungerstation matters towards working on

6 Defendants' exclusive business matters.

7            117.    Defendants, through their acts of unfair competition, have obtained money and

8 value from their business services, and work from Hungerstation's employees, at the expense of

9 Hungerstation due to Defendants' unfair business practices. Hungerstation asks that this Court

10 restore this money to Hungerstation and enjoin Defendants from continuing their illegal business

11 practices.

12                           **PRAYER FOR RELIEF**

13            WHEREFORE, Plaintiff prays for the following relief:

14            A.      Declare that the actions of Defendants, as set out above, violate the Defend Trade

15 Secrets Act, the California Uniform Trade Secrets Act, the Copyright Act, the Computer Fraud

16 and Abuse Act, the California Computer Crime Law, and the California Unfair Competition Law;

17            B.      Award injunctive and equitable relief including, among other things: (1)

18 prohibiting Defendants from engaging in the acts alleged above; (2) require Defendants to

19 disgorge all of their ill-gotten gains to Hungerstation; (3) require Defendants to delete all data

20 surreptitiously or otherwise collected through the acts alleged above; (4) require Defendants

21 delete, and stop distributing, copying or using, all copyrighted materials obtained from

22 Hungerstation; and (4) prohibit Defendants from distributing, using, or profiting from their apps

23 based on Hungerstation's stolen source code;

24            C.      Award damages, including statutory damages and punitive damages where

25 applicable, to Hungerstation in an amount to be determined at trial;

1    D.    Award restitution against Defendants for all money to which Hungerstation is

2    entitled in equity;

3    E.    Order that all products materials infringing Hungerstation's copyrights or

4    misappropriating Hungerstation's trade secrets, including but not limited to the source code, in

5    the possession, custody or control of Defendants be seized;

6    F.    Awarding of Plaintiffs' reasonable attorneys' fees;

7    G.    Awarding to Plaintiffs their costs in bringing this action;

8    H.    Awarding other such relief to Plaintiffs as this Court deems just.

9                                    **<u>JURY DEMAND</u>**

10   Plaintiffs hereby demand a jury trial on all issues so triable.

11

12

13   Dated:  September 19, 2019              Respectfully submitted,

14

15                                   */s/ Neel Chatterjee*
                                     Neel Chatterjee (SBN 173985)
16                                   *nchatterjee@goodwinlaw.com*
                                     Luc Dahlin (SBN 305732)
17                                   *ldahlin@goodwinlaw.com*
                                     Daniel Mello (SBN 325714)
18                                   *dmello@goodwinlaw.com*
                                     **GOODWIN PROCTER LLP**
19                                   601 Marshall Street
                                     Redwood City, CA 94063
20                                   Tel.: +1 650 752 3100
                                     Fax.: +1 650 853 1038
21

22                                   *Counsel for Plaintiff*

23

24

25

---

COMPLAINT FOR DAMAGES AND EQUITABLE RELIEF        CASE NO. 3:19-CV-5861
                                    24

## **PROOF OF SERVICE**

At the time of service I was over 18 years of age and not a party to this action. My business address is:  601 Marshall Street, Redwood City, California  94063.

On **September 19, 2019**, I served the following document(s) on the person(s) below as follows:

- **COMPLAINT**

- **PROOF OF SERVICE**

Fast Choice LLC d/b/a Pace                                                                 *Defendant*
Anas Bin Malek Road, Al Yasmin, Riyadh 11942, Saudi Arabia.

Inspiring Trading Apps LLC d/b/a Swyft                                          *Defendant*
Al Khobar 34423, Saudi Arabia

> ■   (MESSENGER SERVICE)  By messenger service.  I served the document(s) by placing it/them in an envelope or package addressed to the person(s) at the address(es) listed above and providing them to a professional messenger service for service. (*A declaration by the messenger must accompany this Proof of Service or be contained in the Declaration of Messenger below.*)

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on **September 19, 2019**, at Redwood City, California.

Neel Chatterjee                                                  */s/ Neel Chatterjee*
**(Type or print name)**                                    **(Signature)**

1

## DECLARATION OF MESSENGER

2

■   (PERSONAL SERVICE).  By personal service. I personally delivered the document(s) to the person(s) at the address(es) listed above. [1] For a party represented by an attorney, delivery was made to the attorney or at the attorney's office by leaving the document(s), in an envelope or package clearly labeled to identify the attorney being served, with a receptionist or an individual in charge of the office, between the hours of nine (9) in the morning and five (5) in the evening. [2] For a party, delivery was made to the party or by leaving the document(s) at the party's residence with some person not younger than 18 years of age between the hours of eight (8) in the morning and six (6) in the evening.

3

4

5

6

7   At the time of service, I was over 18 years of age.  I am not a party to the above-referenced legal proceeding.

8   I served the envelope or package, as stated above, on _____, 2019.

9   I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

10   Executed on _____, 2019.

11

_____          _____

12               **(Type or print name)**                              **(Signature)**

13

14

15

16

17

18

19

20

21

22

23

24

25

COMPLAINT FOR DAMAGES AND EQUITABLE RELIEF       CASE NO. 3:19-CV-5861